No. 87,407

STATE OF KANSAS, *Appellee*, v. REBECCA BEACH, *Appellant*.

67 P.3d 121

Opinion filed April 25, 2003.

*Rebecca E. Woodman,* capital appellate defender, argued the cause and was on the brief for appellant.

*Sheryl L. Lidtke,* assistant district attorney, argued the cause, and *David C. Smith,* assistant district attorney, *Nick A. Tomasic,* district attorney, and *Carla J. Stovall,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Rebecca Beach appeals her jury convictions and sentences for first-degree felony murder based on underlying felonies of aggravated robbery and the sale of methamphetamine and attempted second-degree intentional murder. The jury acquitted Beach of the underlying felony, aggravating robbery, and a charge of conspiracy to commit first-degree murder. Beach raises the following claims in this appeal: Her felony-murder conviction should be reversed because (1) the underlying sale of methamphetamine is legally and factually insufficient to support felony murder; (2) she was acquitted of the other underlying felony, aggravated robbery; (3) the trial court failed to instruct the jury that it had to be unanimous in deciding which underlying felony supported the felony murder; and (4) the trial court failed to instruct the jury that it had to find that the defendant reasonably could foresee or expect that a life would be taken by engaging in the underlying felonies. For her fifth assignment of error, Beach contends that there was insufficient evidence to establish attempted second-degree murder.

## Facts

On June 23, 2000, Land Grant was shot to death while in his automobile waiting to complete a drug transaction. A passenger in his automobile, Margaret Thomas, was also shot and severely injured. The State alleged that Beach, along with Jose Arevalo and Jerry Zugelder, planned to rob and kill Grant. The State also alleged that Beach, Arevalo, and Jesse Jiminez actually carried out the plan. The jury found Beach guilty of first-degree felony murder and attempted second-degree murder.

Grant lived in Topeka and used Beach as a contact for purchasing drugs in Kansas City. Beach knew Grant through an ex-boyfriend who met Grant while in prison. Grant contacted Beach, wanting to know if her ex-boyfriend was out of prison. Grant again contacted Beach 3 to 4 months before the shooting, wanting to do a drug deal. Before the shooting, Grant had purchased drugs in Kansas City through Beach several times previously. Grant would telephone Beach as to the quantity of methamphetamine he needed, drive from Topeka, and pick up Beach, and they would drive to the location where the transaction was to occur. One pound of methamphetamine would cost $6,000 and two pounds $10,000. Beach would make $1,000 per transaction. After completing the purchase, Grant would take Beach home.

At trial, Beach denied any knowledge of a plan to kill or rob Grant during the drug transaction in which Grant was killed. She testified that on the day of the shooting, Grant called her at 10 a.m., told her he would be in Kansas City that night, and wanted to purchase between 4 and 5 pounds of methamphetamine. He later called and said he wanted only 2 pounds. As he was leaving Topeka, Grant called Beach to tell her he would page her when he arrived in Kansas City. Beach tried calling the supplier, but no one accepted her telephone calls. Arevalo was with her when she made the calls, and he told Beach that he would get the drugs.

Beach testified that she and Arevalo eventually met someone riding in a Blazer. Arevalo and the man in the Blazer spoke in Spanish. Arevalo returned to Beach's car and said he had a connection. The man in the Blazer got into Beach's car as well. They

drove to 714 Homer, where the transaction would take place. Beach left to meet Grant.

Beach met Grant at a gas station in Kansas City. Grant was with someone, and Beach testified she thought Grant brought the passenger to make her jealous. At that time, Beach told Grant she got a page from her mother and needed to call her. Grant offered his cell phone, but Beach refused and made the call from a pay telephone at the gas station. She then led Grant to 714 Homer. Grant backed in. Beach took the money and asked if her cut was included. She went to the house and knocked on the door. Beach pushed her way into the house and then heard gunshots. Beach thought there was a robbery by someone off the street and shut the door and hid. When the gunshots ceased, Beach stepped outside and saw Arevalo. Beach heard a woman scream.

Beach testified that after the shooting, Arevalo asked Beach to come with him. Beach knew by this time that Arevalo was the one shooting, so she did not want to go with him. Arevalo cocked his gun and told her to get in the car. Beach walked to the car, unlocked it, and let Arevalo in. Beach started driving away when Jiminez ran out of the bushes and jumped in. Jiminez was angry with Arevalo and indicated that he did not think Grant was going to be killed. Beach gave the money to Arevalo. Beach drove Arevalo and Jiminez to Zugelder's house, and Jiminez and Arevalo went inside. Beach did not leave because she was afraid. Arevalo stayed in the house 20 minutes. Finally, Beach left with Arevalo, and they went to Beach's house. Arevalo stayed close to Beach for 3 or 4 days.

Beach was arrested a month later. According to Beach, Arevalo told her that he would not go down alone for the killing, meaning that either Arevalo would kill her or blame her.

Beach's testimony at trial was corroborated by her mother, Carla Simpson. However, her trial testimony contradicted, in part, her statements she made to officers investigating the homicide. The State called Detective William Howard who had been able to link Beach to a location in Raytown based on Grant's cell phone. In her initial discussion with Detective Howard, Beach denied knowing Grant but later admitted her ex-boyfriend knew Grant. Beach later said that she knew Grant was killed from news reports.

Detective Howard testified about a conversation he had with Beach on the way to the detective bureau. Beach admitted she was the go-between in past drug deals for Grant. She admitted that Grant had made arrangements to contact her the day of the shooting but never showed up. She later admitted that she met Grant and took him to another location. She directed Detective Howard to the gas station where she met Grant. She told him that she drove Grant and Thomas to a location other than the scene of the shooting. Beach showed Detective Howard the route she took and where Grant allegedly parked. She also stated that she took the money from Grant.

In a later statement, Beach continued to deny any knowledge that there would be a homicide or robbery. Beach said she was struck on the back of head with a skillet upon entering 714 Homer. In a photo array presented by Detective Howard, Beach identified a man unrelated to this case as the person who lived at 714 Homer. Beach denied knowing who was involved in the homicide. Beach's recorded statement was played for the jury.

### The Evidence of Conspiracy

The State called an alleged coconspirator, Gerald Zugelder, to testify. In return for his testimony, Zugelder was permitted to plead to conspiracy to commit murder. Zugelder testified that approximately a week before the murder, he and Arevalo met to discuss the killing of Grant, as they knew Grant would have money through Beach. Zugelder was going to be the trigger man. The plan was for Zugelder to come to Grant's car when Beach walked into the house. Beach was not present at this meeting.

Zugelder testified that there was another meeting at Beach's house approximately 2 or 3 days before the killing with Zugelder, Arevalo, and Beach present. According to Zugelder, Beach wanted Arevalo and Zugelder to make sure Grant died in the robbery because Beach feared Grant would hurt her and her family if he suspected her involvement in the robbery. Zugelder testified that he could not participate in the robbery because his girlfriend would be angry with him for leaving her. Arevalo had to find someone else to help him with the murder and robbery.

## The Shooting

The State called Margaret Thomas who traveled with Grant to Kansas City on the day of the shooting. She testified that she knew that Grant was a drug dealer and that he had $36,000 with him that day, a part of which was for the purchase of drugs. Upon arriving in Kansas City, Grant began paging Beach who returned his page and met them at a gas station. Beach needed to call her mother, and Grant offered his cell phone. Beach refused and made the call at the gas station pay telephone. Upon her return from the telephone call, Beach told Grant to follow her. When they arrived, Grant reversed into his parking spot with his automobile facing the street. Beach walked to Grant's car and received from Grant a bag with $13,000. According to Thomas, Beach then walked back to her car.

Thomas testified that she was nervous after Beach left. She told Grant to lock the doors and roll up the windows. At this point, two men began running toward Grant's car, shooting at his car. Thomas screamed and yelled at Grant to drive away. Thomas waited until the shots ceased and then put the car in drive. Thomas said a man appeared at the driver's side window and said, "Bitch, you're gonna die." Then the man shot Thomas. The car was moving at this point, and Thomas eventually jumped out and ran, trying to get someone to stop and help her. Thomas remembers passing out and then regaining consciousness later in the hospital. Thomas testified that as a result of the bullet wounds, she suffered a collapsed lung, the removal of her spleen, and multiple wounds to her stomach.

Aaron Mindrup, who witnessed Thomas in Grant's car after the shooting, testified that he saw a Cadillac roll between two buildings. A woman jumped out of the car, ran to Mindrup's car and said, "Help me. I've been shot." Mindrup, who had medical training, went to the Cadillac to check on the person in the driver's seat. Mindrup found no pulse. Mindrup then ran to Thomas and applied pressure to her chest.

The State also called Jennifer Loman, who was incarcerated for the sale of methamphetamine at the same time Beach was being held in jail. She testified that Beach told her she was being held for

felony murder for a drug deal she set up. Beach also mentioned at one time that "the girl was not supposed to live."

(1) Sufficiency of sale of methamphetamine to support felony murder

Beach was charged in the alternative with first-degree felony murder under K.S.A. 21-3401(b). A defendant is guilty of felony murder if, "in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436 and amendments thereto," a human being is killed. The sale of methamphetamine is deemed an inherently dangerous felony in Kansas. See K.S.A. 2002 Supp. 21-3436(a)(14); K.S.A. 65-4161.

The trial court instructed the jury to find Beach guilty of felony murder if it found the following elements:

"To establish this charge, each of the following claims must be proved:
"1. That the defendant, or another, killed Land S. Grant;
"2. That such killing was done while in the commission of, or attempt to commit, or in flight from committing a felony, to-wit: aggravated robbery and/or sale of methamphetamine; and
"3. That this at occurred on or about the 23rd day of June, in Wyandotte County, Kansas."

The court instructed the jury on the definition of sale of methamphetamine (see K.S.A. 65-4161[a] K.S.A. 65-4107[d][3]):

"The elements of sale of methamphetamine are as follows:
"1. That the defendant sold methamphetamine;
"2. That the defendant did so intentionally; and
"3. That this act occurred on or about the 23rd day of June, in Wyandotte County, Kansas."

Beach's argument is twofold. First, she challenges the legal sufficiency of the sale to support felony murder, claiming that the crime of sale was already completed at the time of the killing. Second, Beach argues that the State failed to present sufficient evidence of a causal connection between the sale and Grant's killing.

Beach's first argument concerning legal insufficiency is without merit. The jury was properly instructed to convict Beach of felony murder if it found that Grant was killed "while in the commission

of, or attempt to commit, or in flight from committing" sale of methamphetamine or aggravated robbery. This issue is a factual one for the jury. See *State v. Jacques*, 270 Kan. 173, 189-91, 14 P.3d 409 (2000).

In *Jacques*, the defendant was convicted of felony murder with possession of cocaine as the underlying felony crime. Jacques and his friend, Everitt, had developed a scheme to purchase drugs. The plan called for Jacques to stay away from the house where the drugs were to be purchased. However, Jacques went to the house where Everitt was purchasing the drugs. Everitt was angry that Jacques failed to follow the plan and a fight broke out between them, resulting in Everitt's stabbing death. Jacques went back into the house and completed the purchase.

On appeal, Jacques raised the sufficiency of the evidence, arguing that he could not be guilty of felony murder because "he did not possess cocaine at the same time that he stabbed Everitt and did not have any intent to possess cocaine at the time." 270 Kan. at 189. The court discussed the necessary timing of the underlying felony crime and the killing:

"When applying the felony-murder rule, however, the felony and the victim's death do not need to occur simultaneously, nor does the felony need to occur before the death. Time, distance, and the causal relationship between the underlying felony and the killing are factors to be considered in determining whether the killing is a part of the felony and therefore subject to the felony-murder rule. [Citations omitted.]

"We hold that the death need not occur during or after the commission of the felony to support a conviction for felony murder. The question for the jury is whether the death is within the res gestae of the crime, regardless of the actual sequence of events. [Citations omitted.]" 270 Kan. at 189-90.

In its analysis, *Jacques* found that the "attempt by Everitt to purchase cocaine, the stabbing of Everitt, and the subsequent purchase of the cocaine by Jacques were part of one continuous transaction." 270 Kan. at 190.

Thus, the appropriate standard of review on appeal is a familiar one set forth in *Jacques*:

"A review of all of the evidence, when viewed in a light most favorable to the prosecution, shows that a rational factfinder could have found Jacques guilty of felony murder beyond a reasonable doubt. A rational factfinder could have con-

cluded that the stabbing was within the res gestae of the possession of cocaine. Thus, there was sufficient evidence to support the conviction of Jacques for felony murder." 270 Kan. at 191.

See *State v. Kaesontae*, 260 Kan. 386, 390, 920 P.2d 959 (1996); *State v. Hearron*, 228 Kan. 693, 696, 619 P.2d 1157 (1980) ("Whether the underlying felony had been abandoned or completed prior to the killing so as to remove it from the ambit of the felony-murder rule is ordinarily a question of fact for the jury to decide.").

Nevertheless, Beach argues that it was after an "exchange" that Grant was shot and killed. However, there was no evidence of an exchange. The only evidence confirmed by Beach's own testimony was that Grant gave Beach money. She was in the middle of the transaction and would not have completed it until she had gone inside the house and returned with the methamphetamine.

Beach also relies upon the broad definition of "sale" to support her argument. This court has in the past noted the broad definition of "sale" but that broad definition of "sale" fails to provide authority for concluding that the crime was completed in this case. See *State v. Griffin*, 221 Kan. 83, 84, 558 P.2d 90 (1976) ("A 'sale' of drugs is given a much wider meaning than a 'sale' in the context of commercial law."); *State v. Mauldin*, 215 Kan. 956, 959, 529 P.2d 124 (1974) ("Our statute explicitly requires that the killing be 'committed in the perpetration or attempt to perpetrate any felony.' Under the facts presented in the instant case the commission of the felony [the act of selling heroin] completely terminated when the seller and the purchaser parted company.").

In the light most favorable to the prosecution, the evidence shows a rational factfinder could have found that Grant was killed while Beach was engaged in the sale of methamphetamine. We, therefore, reject Beach's first challenge to the sufficiency of the sale of methamphetamine to support her felony murder conviction.

For her second argument Beach claims that the State presented insufficient evidence of the causal connection between the killing and the sale of methamphetamine. Again our standard of review is one of the sufficiency of evidence to support her felony-murder conviction.

In *State v. LaMae*, 268 Kan. 544, 555, 998 P.2d 106 (2000), this court described the requirement of a direct causal connection:

"It is true that there must be a direct causal connection between the commission of the felony and the homicide to invoke the felony-murder rule. [Citation omitted.] However, the general rules of proximate cause used in civil actions do not apply. Rather, a defendant will be found not responsible for the death which occurs during the commission of a felony only if an extraordinary intervening event supersedes the defendant's act and becomes the sole legal cause of death. See *Bonhart v. U.S.*, 691 A.2d 160, 162-63 (D.C. 1997) (act of person going back into burning house to rescue dog not sufficient to break chain of causation for felony murder based on arson); *State v. Leopold*, 110 Conn. 55, 62, 147 A. 118 (1929) (act of boys in attempting to rescue personal possessions from house not sufficient to break chain of causation for felony murder based on arson)."

Beach argues that it was the plan and actions of Arevalo and Jiminez that caused the death of Grant, thereby, amounting to an extraordinary intervening event as that phrase was used in *LaMae*. Beach points to her acquittal of aggravated robbery of Grant and of the conspiracy to kill Grant. In support, she relies upon our recent decision in *State v. Sophophone*, 270 Kan. 703, 19 P.3d 70 (2001), and *State v. Murphy*, 270 Kan. 804, 19 P.3d 80 (2001). Neither case provides support for her argument.

In *Sophophone*, this court reversed the defendant's conviction for felony murder based upon the underlying felony of aggravated burglary. During the commission of the burglary, the defendant, along with three others, scattered when police officers arrived at the scene. The defendant was tracked down, secured with handcuffs, and placed in a police car. Thereafter, a police officer chased another of the burglars. The other burglar shot at the police officer, who returned fire, killing the burglar.

On appeal, the defendant argued that under the Kansas felony-murder statute, he could not be criminally responsible for the killing because he was in custody at the time of the killing, thus, there was a " 'break in circumstances' sufficient to insulate him from further criminal responsibility." 270 Kan. at 705. However, the majority disagreed that this was the issue, finding instead the issue to be "whether [the defendant] can be convicted of felony murder for the killing of a co-felon not caused by his acts but by the lawful acts of a police officer acting in self-defense in the course and scope

of his duties apprehending the co-felon fleeing from an aggravated burglary." 270 Kan. at 705. The court found that the defendant could not be so convicted. 270 Kan. at 713.

In *State v. Murphy*, 270 Kan. 804, this court held that a co-felon shot by the victim of the underlying felony supporting the felony-murder charge cannot be liable for the death of that co-felon.

The causal connection required by *LaMae* is discussed in *State v. Hearron*, 228 Kan. at 696:

"Time, distance, and the causal relationship between the underlying felony and the killing are factors to be considered in determining whether the killing is a part of the felony and, therefore, subject to the felony-murder rule. Whether the underlying felony had been abandoned or completed prior to the killing so as to remove it from the ambit of the felony-murder rule is ordinarily a question of fact for the jury to decide."

Grant's murder took place at the exact time of Beach's involvement in what she believed to be a sale of methamphetamine, according to her own testimony. Beach received the money from Grant and was on her way to exchange the money for drugs. Beach had not exchanged the money for the drugs, had not returned to Grant, and had not given Grant the drugs by the time the shooting began. Based upon time, the jury rationally concluded the sale of methamphetamine was part of the killing.

Beach's plan to facilitate the drug transaction took Grant to the location of his eventual murder. Grant did not move while Beach went to the house to complete the transaction. Based upon the distance between the sale of methamphetamine and the killing, the jury rationally concluded the sale of methamphetamine was part of the killing.

While Beach, under her theory of the facts, has a visceral argument that Arevalo's appearance with guns blazing constitute an "extraordinary intervening event [that] supersedes the defendant's act and becomes the sole legal cause of death," *LaMae*, 268 Kan. at 555, Arevalo's act was not, upon further consideration, an extraordinary intervening event in light of her plan to sell methamphetamine. Arevalo learned of the transaction through Beach. Thus, without Beach, Arevalo would not have known that Grant was coming to the city. Further, based upon the nature of the

transaction, Beach let it be known to Arevalo that Grant would be carrying a large amount of cash. A person with a large amount of cash intent on engaging in an illegal transaction is a foreseeable target of a violent crime. Thus, based upon the causal connection between the sale of methamphetamine and the killing, the jury rationally concluded the killing was part of the sale of the methamphetamine.

As a final note, the jury had evidence from a coconspirator that Beach planned the robbery and the death of Grant. There was further testimony that it was her intent before the transaction that both Grant and Thomas would be killed before the sale was completed. While the jury acquitted Beach of the aggravated robbery and the conspiracy to kill, her conviction of felony murder in the sale of methamphetamine, as discussed below, does not require reversal. We conclude that a rational factfinder could have concluded upon all evidence considered in a light most favorable to the State that the killing of Grant was part of the sale of methamphetamine and that Arevalo's killing of Grant was not an extraordinary intervening event.

(2) Acquittal of Aggravated Robbery

Beach argues that there was insufficient evidence to support her conviction of felony murder based upon the underlying crime of aggravated robbery. Beach relies on the fact that the jury acquitted her of conspiracy to commit first-degree premeditated murder and aggravated robbery.

If the jury's acquittal of the crime of conspiracy to commit first-degree murder and the crime of aggravated robbery is ignored for a moment, it is clear that the State presented sufficient evidence to support the finding that Beach committed the crime of aggravated robbery. Zugelder testified that 2 or 3 days before the shooting there was a meeting between Zugelder, Arevalo, and Beach in which Beach emphasized the importance of killing Grant. Further, Beach's comments in the presence of her jail cellmate further implicate Beach in the crime of aggravated robbery and the death of Grant, as well as the attempted murder of Thomas. In terms of a traditional sufficiency of the evidence analysis, this would be suf-

ficient to conclude that a rational factfinder could have found Beach guilty beyond a reasonable doubt. See *State v. Jasper*, 269 Kan. 649, 655, 8 P.3d 708 (2000) ("When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.").

However, the jury acquitted Beach of direct culpability for the crime of conspiracy to commit first-degree murder and the crime of aggravated robbery. The question becomes whether this court must accept the jury's finding for purposes of analyzing the felony murder based upon the aggravated robbery. Beach cites no authority to support her position that this court is precluded on appeal from analyzing the felony murder conviction based upon a felony for which the defendant was absolved of direct responsibility.

*State v. Shultz*, 225 Kan. 135, 142, 587 P.2d 901 (1978) (quoting *State v. McCorgary*, 218 Kan. 358, 543 P.2d 952 [1975], *cert. denied* 429 U.S. 867 [1976]), noted that reversal is not required in cases where two verdicts are irreconcilable. See *State v. Meyer*, 17 Kan. App. 2d 59, 65, 832 P.2d 357 (1992). *State v. Wise*, 237 Kan. 117, 122-23, 697 P.2d 1295 (1985), summarized a New York case, *People v. Murray*, 92 App. Div. 2d 617, 459 N.Y.S.2d 810 (1983), as follows: "In the latter case, the court held that the completion of the underlying felony is not an essential element of felony murder, and that an acquittal of the underlying felony is not inconsistent with a conviction of felony murder." *Wise* also noted that "[a]t any rate, consistency in a verdict is not necessary; a verdict, though inconsistent, is not erroneous so long as there is sufficient competent evidence to support it." *Wise*, 237 Kan. at 122-23. *Wise* also specifically held that a charge and conviction of the underlying felony is not necessary to sustain a conviction of felony murder: "We hold that under our statute, K.S.A. 21-3401, an accused need not be prosecuted [for] or convicted of the underlying felony in order to be convicted of felony murder." *Wise*, 237 Kan. at 123; see *State v. Antwine*, 4 Kan. App. 2d 389, 396, 607 P.2d 519 (1980)

("While the verdict may be somewhat inconsistent, substantial competent evidence exists to support it and we find no error. Our Supreme Court has recognized that a jury may sometimes reach its verdict partially out of clemency for the accused.").

An inconsistent jury verdict is defined as follows:

"Where an accused is charged with separate and distinct crimes, although of a similar character, in two or more counts, a verdict of acquittal on one or more counts and of conviction on the others is not ordinarily or necessarily inconsistent, at least where each offense requires different evidence or involves factual variations. When accused is convicted on one count and is acquitted on another count, the test is whether the essential elements in the count wherein accused is acquitted are identical and necessary to proof of conviction on the guilty count.

"Hence, where the elements of the two offenses are identical, a verdict of not guilty on one count is inconsistent with a verdict of guilty on the other count. Also, a verdict which acquits accused of a crime which includes acts necessary to the commission of another crime for which he is found guilty is inconsistent. However, acquittal under a count charging a major offense is not inconsistent with a conviction under a count charging a lesser included offense." 23A C.J.S., Criminal Law § 1407, pp. 347-48.

See *State v. Meyer*, 17 Kan. App. 2d at 66.

The same issue we face in this case has been decided by the Georgia Supreme Court. *Robinson v. State*, 257 Ga. 194, 357 S.E.2d 74 (1987), involved a felony-murder conviction. The defendant was found not guilty of cruelty to children, which was the crime upon which the felony- murder theory rested. The Georgia court rejected the defendant's argument that his conviction of felony murder should be reversed based upon the acquittal of cruelty to children, the underlying felony:

"3. In his third enumeration of error, appellant claims that since the jury did not convict him of the underlying felony of cruelty to children, he could not be guilty of felony murder. 'We have held that if there is a single victim one may not be convicted both of the underlying felony and of felony murder.' [Citations omitted.] . . . There is no basis for a claim that the felony murder conviction must be set aside because a finding of not guilty of cruelty to children is inconsistent with a finding of guilty of felony murder when the underlying felony is cruelty to children. This is true because in Georgia we have abolished the inconsistent verdict rule. [Citation omitted.] See *United States v. Powell*, 469 U.S. 57 (105 S. Ct. 471, 83 L. Ed. 2d 461) (1984); *Dunn v. United States*, 284 U.S. 390 (52 S. Ct. 189. 76 L. Ed. 356) (1932), for the proposition that inconsistent verdicts need not be set aside but may be construed as an indication of leniency on the part of the

jury even in the case of acquittal on the predicate felony and conviction on the compound felony. In the present case, there is no doubt that the evidence showed the elements of the underlying felony, cruelty to a child, and that the jury was authorized to find the appellant guilty of felony murder." 257 Ga. 195-96.

The Michigan Supreme Court has likewise adopted a rule that verdicts are not required to be consistent. See *People v. Vaughn*, 409 Mich. 463, 465, 295 N.W.2d 354 (1980) (citing *Dunn v. United States*, 284 U.S. 390, 76 L. Ed. 356, 525 S. Ct. 189 [1932]); *People v. Baynes*, 2002 W.L. 1998569 (Mich. App. 2002) (unpublished opinion) (applying the rule in *Vaughn* to a felony-murder case in which the jury acquitted the defendant of the underlying felony).

In *State v. Wise*, 237 Kan. 117, 697 P.2d 1295 (1985), this court, relying on a prior case of *State v. Freeman*, 198 Kan. 301, 304, 424 P.2d 261 (1967), concluded that "an accused need not be prosecuted [for] or convicted of the underlying felony in order to be convicted of felony murder under K.S.A. 21-3401." 237 Kan. 117, Syl. ¶ 3. Consistent with Georgia and Michigan, this court in *Wise* relied on *Dunn*, 284 U.S. 390.

In *Dunn*, the defendant was convicted by jury of maintaining a common nuisance by keeping for sale at a specified place intoxicating liquor but was acquitted of the unlawful possession of intoxicating liquor and the unlawful sale of such liquor. On appeal, the defendant argued that there was insufficient evidence to sustain the conviction, citing the inconsistency in the verdicts. The court rejected the defendant's argument:

"Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment. [Citation omitted.] If separate indictments had been presented against the defendant for possession and for maintenance of a nuisance, and had been separately tried, the same evidence being offered in support of each, an acquittal on one could not be pleaded as res judicata of the other. Where the offenses are separately charged in the counts of a single indictment the same rule must hold. As was said in *Steckler v. United States*, 7 F.(2d) 59, 60:

'The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.'

"Compare *Horning v. District of Columbia*, 254 U.S. 135, 65 L. Ed. 185, 41 S. Ct. 53.

"That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters." 284 U.S. at 393-94.

The United States Supreme Court reexamined the rule in *Dunn* in *United States v. Powell*, 469 U.S. 57, 83 L. Ed. 2d 461, 105 S. Ct. 471 (1984). The defendant in *Powell* appealed her conviction of three counts of using a telephone to commit certain drug crimes. On appeal, the defendant argued that these convictions should be reversed because each of them contained an element requiring the jury to find that she had either conspired to possess cocaine with the intent to distribute or had possessed cocaine—offenses for which she had been acquitted of direct liability. The Ninth Circuit agreed with the defendant, finding that "an acquittal on the predicate felony necessarily indicated that there was insufficient evidence to support the telephone facilitation conviction." 469 U.S. at 61.

Writing for a unanimous court, Justice Rehnquist reversed the Ninth Circuit Court of Appeals and held that when there is jury inconsistency based on the conviction of a compound offense but acquittal on the predicate offense, there are no grounds for the defendant to attack the conviction. 469 U.S. at 69.

*Powell* discussed the *Dunn* decision, concluding that "[f]ifty-three years later most of what Justice Holmes so succinctly stated retains its force." 469 U.S. at 63. *Powell* cited a number of factors to support its conclusion including "the Government's inability to invoke review, the general reluctance to inquire into the workings of the jury, and the possible exercise of lenity." 469 U.S. at 68-69.

With regard to the Government's inability to invoke review, *Powell* said that the State is not permitted under the Double Jeopardy Clause of the United States Constitution to challenge an acquittal. 469 U.S. at 65. This fact, combined with the fact that it is not clear whether the State or the defendant benefitted from the inconsistency, would make it unfair to permit the defendant to challenge a conviction based upon an inconsistent verdict:

"Inconsistent verdicts therefore present a situation where 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored. Given this uncertainty, and the fact that the Government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course." 469 U.S. at 65.

With respect to the reluctance to inquire into the workings of the jury, *Powell* rejected the idea that reviewing courts should attempt to discover whether the inconsistency was the result of a mistake on the part of the jury:

"We also reject, as imprudent and unworkable, a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them. Such an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake. Jurors, of course, take an oath to follow the law as charged, and they are expected to follow it. [Citation omitted.] To this end trials generally begin with voir dire, by judge or counsel, seeking to identify those jurors who for whatever reason may be unwilling or unable to follow the law and render an impartial verdict on the facts and the evidence. But with few exceptions, [citations omitted], once the jury has heard the evidence and the case has been submitted, the litigants must accept the jury's collective judgment. Courts have always resisted inquiring into a jury's thought processes [citations omitted]." 469 U.S. at 66-67.

*Powell* addresses the "possible exercise of lenity," concluding that leniency could explain a jury's inconsistent verdict. 469 U.S. at 69. *Powell* suggested that the power of leniency was part of the "jury's historic function, in criminal trials, as a check against arbitrary or oppressive exercises of power by the Executive Branch." 469 U.S. at 66. However, the court reiterated the point made in *Dunn*, 284 U.S. 390, that such jury acts of leniency are "an 'assumption of a power which [the jury has] no right to exercise,' but the illegality alone does not mean that such a judgment should be subject to review." *Powell*, 469 U.S. at 66. The Court implicitly found the jury's power of leniency was one worth protecting.

*Powell* also noted that there is sufficient protection to the criminal defendant under the traditional review of the sufficiency of the evidence:

"Finally, we note that a criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts. Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt. [Citations omitted.] This review should be independent of the jury's determination that evidence on another count was insufficient. The Government must convince the jury with its proof, and must also satisfy the courts that given this proof the jury could rationally have reached a verdict of guilt beyond a reasonable doubt. We do not believe that further safeguards against jury irrationality are necessary." 469 U.S. at 67.

Analysis of this issue is found at Muller, *The Hobgoblin of Little Minds? Our Foolish Law of Inconsistent Verdicts,* 111 Harv. L. Rev. 771 (1998). Muller identifies two types of inconsistent verdicts: (1) multiple-count inconsistencies, and (2) multiple-defendant inconsistencies. There is a potential multiple-count inconsistency at play in Beach's case. Muller offers three explanations for the jury's inconsistent verdict: (1) mistake or confusion; (2) compromise; and (3) lenity. Muller then discusses the three rationales offered by *Dunn* and *Powell,* which Muller names as (1) the argument from uncertainty; (2) the argument from equity; and (3) the argument from remedy. Muller is critical of the three rationales provided in *Powell,* which he says are "shallow and careless depictions of what is really at stake when a jury reaches an inconsistent verdict." 111 Harv. L. Rev. at 794.

Muller cites *Wise,* 237 Kan. 117, and counts Kansas as among the states that do not demand consistency on multiple counts against a single defendant. 111 Harv. L. Rev. at 787 n.80.

*People v. Klingenberg,* 172 Ill. 2d 270, 665 N.E.2d 1370 (1996), represents authority for the refusal to rely on the United States Supreme Court in *Dunn* and *Powell. Klingenberg* refused to follow the reasoning in *Powell* and rejected the leniency argument, finding that "[a]ny attempt to reconcile verdicts such as those here, where the jury acquits the defendant of the predicate offense and convicts him of the compound offense, on the basis of jury lenity defies logic and common sense." 172 Ill. 2d at 278. While *Klingenberg* might be correct that it would be more lenient to acquit

the defendant of the compound offense and convict the defendant of the predicate offense, *Klingenberg* does not explain why it defies common sense to say a jury is not also being lenient by convicting a defendant of one offense instead of two.

*Klingenberg* rejected the argument which Muller referred to as the argument from equity: "We are not persuaded that the framers of the double jeopardy clause intended to achieve the symmetry between defendants and the prosecution that the *Powell* decision creates." 172 Ill. 2d at 279. As for remedy, *Klingenberg* suggested that the trial court should have required the jury to deliberate further. 172 Ill. 2d at 279.

In responding to the prosecutor's argument that collateral estoppel principles under the Fifth Amendment double jeopardy analysis had no bearing on inconsistent verdicts rendered in a single proceeding, *Klingenberg* announced the court's fundamental basis for its holding:

"Our long-standing rule prohibiting legally inconsistent verdicts rendered in a single proceeding, however, need not rest upon collateral estoppel principles derived from provisions of the United States or Illinois Constitution. Rather, the rule is based on common sense and sound logic. Legally inconsistent verdicts cannot stand because they are unreliable. At a minimum, such verdicts suggest confusion or misunderstanding on the part of the jury. Legally inconsistent verdicts are particularly unreliable in cases such as this, where the jury acquits a defendant of a predicate offense and convicts of the compound offense. In such a case, the former verdict necessarily suggests that the evidence failed to establish an essential element of the compound offense. At the very least, the inconsistency constitutes evidence of arbitrariness that undermines confidence in the quality of the jury's conclusion. We can have no confidence in a judgment convicting the defendant of one crime when the jury, by its acquittal on another crime, has rejected an essential element needed to support the conviction. In such circumstances, the conviction, as a matter of law, cannot stand. We therefore hold, as did the appellate court, that the defendant's official misconduct conviction must be reversed." 172 Ill. 2d at 281-82.

The dissent in *Klingenberg* called the majority's analysis "unnecessary and outmoded." 172 Ill. 2d at 285. The dissent relied on *Powell*. 172 Ill. 2d at 285-89.

Florida courts also reverse a felony-murder conviction when the jury acquits the defendant of liability for the underlying felony. See *Mahaun v. State*, 377 So. 2d 1158, 1161 (Fla. 1979), *Noel v. State*,

705 So. 2d 648, 650 (Fla. App. 1998), and *Pray v. State*, 571 So. 2d 554, 555 (Fla. App. 1990). *Mahaun* cited prior Florida cases in addition to two United States Supreme Court cases, *Harris v. Oklahoma*, 433 U.S. 682, 53 L. Ed. 2d 1054, 97 S. Ct. 2912 (1977), and *Brown v. Ohio*, 432 U.S. 161, 53 L. Ed. 2d 187, 97 S. Ct. 2221 (1977), but failed to cite *Dunn*, 284 U.S. 390. *Harris* and *Brown* are double jeopardy cases. Muller counts Florida among the minority of states that demand consistency on multiple counts against a single defendant. 111 Harv. L. Rev. at 787 n.79.

Finally, the Corpus Juris Secundum legal encyclopedias suggests that this court's decision in *Wise* is consistent with the general rule:

"Although, according to some authorities a verdict on several counts must not be inconsistent, as a general rule, a verdict on several counts is not void although inconsistent, at least where several offenses are charged. Hence, a verdict of guilty on one count is valid although it is inconsistent with a verdict of acquittal on another count, provided there is sufficient evidence to support the guilty verdict.

"The general rule is applicable where accused is acquitted of a predicate felony but the jury convicts on a compound felony." 23A C.J.S. Criminal Law § 1407, pp. 346-47.

Cases discussing this topic are collected at Annot., 18 A.L.R.3d 259.

The question in this case, consistent with our standard of review set forth in *Jasper*, is whether after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. We conclude that the jury rationally could have found Beach participated in the underlying felony of aggravated robbery. That the jury acquitted Beach of aggravated robbery independent of the felony murder does not impair our conclusion.

### (3) Unanimity Instruction

Beach next argues her conviction of felony murder should be reversed because she was charged with the multiple acts of sale of methamphetamine and aggravated robbery without the jury instruction of unanimity, thus, violating *State v. Hill*, 271 Kan. 929, 26 P.3d 1267 (2001). Beach failed to ask for such instruction at

trial. The State argues that Beach misconstrues the case of felony murder as a multiple acts case rather than an alternative means case.

Our standard of review is set forth in *State v. Mitchell*, 269 Kan. 349, 355, 7 P.3d 1135 (2000):

"When reviewing challenges to jury instructions, we are required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous."

"Generally, when no request or objection is made, we reverse only if the failure to give an instruction was clearly erroneous." *State v. Hooker*, 271 Kan. 52, 57, 21 P.3d 964 (2001).

An argument similar to Beach's was addressed and rejected in *Hooker*. In *Hooker*, the defendant was convicted of aggravated burglary, criminal possession of a firearm, and first-degree felony murder. The jury was instructed that two separate crimes, aggravated burglary and robbery could support the felony murder. On appeal, the defendant argued that "the district court erred by not instructing the jury that it was required to agree on the same underlying felony to convict [the defendant] of felony murder." 271 Kan. at 57. The defendant did not request a unanimity instruction at trial. 271 Kan. at 57.

*Hooker* rejected the defendant's argument, particularly his assumption that the case involved multiple acts rather than multiple means: "The two types of felonies presented to the jury, aggravated burglary and robbery, were alternative means." 271 Kan. at 60. Thus, no unanimity instruction was required. 271 Kan. at 57. Under the alternative means analysis, " '[u]nanimity is not required, however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means.' " 271 Kan. at 58 (quoting *State v. Timley*, 255 Kan. 286, 289, 875 P.2d 242 [1994]).

Under the standard of review provided for in *Mitchell* and more particularly in *Hooker*, Beach's argument fails. The sale of methamphetamine and aggravated robbery are alternative means to commit felony murder. As our analysis above shows, there was

sufficient evidence to sustain a jury verdict on both of the means upon which the jury was instructed. Under these circumstances, the jury instructions were not clearly erroneous.

### (4) Foreseeability

Beach argues the trial court erred in failing to grant her request for a jury instruction regarding the foreseeability that Grant would be killed because of her involvement in the sale of methamphetamine. At trial, Beach requested an additional element to the felony- murder instruction:

"I had requested as a separate element quote, 'the defendant could reasonably foresee or expect that a life might be taken in the perpetration of such felony,' end quote, to add that as a element to the charge of felony murder that used to be required in cases prior to the time that the Kansas State Legislature codified what is an inherently dangerous felony in the State of Kansas. Now, they've taken that out apparently and have said that it is presumed and that presumption is not rebuttable by declaring a certain class of these felonies to be inherently dangerous.

"I think that is a violation of my client's due process rights. I think any time that there is a rebuttable that's—or a presumption that's not rebuttable, it shifts the burden of proof to the defendant on a necessary element and I'd find that to be in violation of the Constitution of the United States, the due process clause."

The trial court denied Beach's requested instruction:

"Well, I tend to agree with the State. I believe our Legislature has taken premeditation and inherently dangerous and foreseeability out of the element equation by classifying certain crimes as inherently dangerous and then they list them. And also by doing so, they also presuppose the foreseeability of death either intentional or accidental or as a byproduct of committing the inherently dangerous felony."

The standard the review for allegations of flawed jury instructions is well known:

"When reviewing challenges to jury instructions, the appellate court is required to consider all the instructions together as a whole and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case, and the jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous. [Citation omitted.] In a criminal case, the court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence. An appellate court must view the evidence in the light most favorable to the party requesting the instruction when considering the trial court's refusal

to give a particular instruction. [Citation omitted.]." *State v. LaMae*, 268 Kan. 544, 553-54, 998 P.2d 106 (2000).

Beach's argument that the trial court erred in failing to instruct the jury that "in order to find [the defendant] guilty of felony murder, the death of [the victim] had to be the direct result of the commission of the felony," fails in light of this court's analysis in *LaMae*, 268 Kan. at 554. *LaMae* explained the defendant's argument as follows: "The defendant argues that under Kansas law, the death must be a direct result of the felony and the trial court's failure to so instruct the jury prevented him from effectively arguing the intervening cause of Jones' own negligence in her death." 268 Kan. at 554-55. *LaMae* rejected the defendant's argument. *LaMae* noted that "there must be a direct causal connection between the commission of the felony and the homicide to invoke the felony-murder rule." There is no criminal liability if "an extraordinary intervening event supersedes the defendant's act and becomes the sole legal cause of death." 268 Kan. at 555. However, *LaMae* concluded that the existing pattern instructions, PIK Crim. 3d 56.02, properly and fairly state the law regarding causation under felony murder:

"PIK Crim. 3d 56.02 sufficiently incorporates the causation required under the law. The instructions require not only that the death occur during the commission of the felony but that the killing actually be perpetrated by the defendant or another in the commission of the felony. An extraordinary intervening cause would negate this latter element. Thus, if the jury found that the defendant or another was responsible for the death in the commission of the felony, the jury by definition found that no extraordinary intervening cause existed that was the sole cause of the death. The trial court did not err in failing to give the instruction requested by the defendant." 268 Kan. at 555.

Beach cites a number of cases to support her position that foreseeability is a requirement to the application of the felony-murder rule. Each of them predate the language in K.S.A. 21-3401(b) which refers to K.S.A. 21-3436 to define "inherently dangerous felony." L. 1992, ch. 298, sec. 3. The most recent of the cases cited by Beach, *State v. Chism*, 243 Kan. 484, 490, 759 P.2d 105 (1988), held that "[w]here the underlying felony is one inherently dangerous to human life, the foreseeability requirement is established as

a matter of law." Since *Chism*, the legislature has made the sale of methamphetamine an inherently dangerous felony. K.S.A. 2002 Supp. 21-3436; see *State v. Mitchell*, 262 Kan. 687, 691, 942 P.2d 1 (1997) ("Mitchell acknowledges that sale of cocaine is an inherently dangerous felony under K.S.A. 21-3436[a][14], and is therefore a sufficient underlying crime for felony murder."). Beach argues that such legislation presumes the *mens rea* for murder, which, according to Beach, has come under significant attack. It is true that the commission of a felony supplies the *mens rea* necessary for murder. See *State v. Wakefield*, 267 Kan. 116, 136, 977 P.2d 941 (1999) ("The ostensible purpose of the felony-murder doctrine is to deter those engaged in dangerous felonies from killing negligently or accidentally.").

The jury was instructed that it should find Beach guilty if it found that Grant was killed in the commission of the sale of methamphetamine. Under similar circumstances, *LaMae* held that such an instruction adequately instructed the jury, with respect to extraordinary intervening causes that could have absolved Beach of criminal liability. As in *LaMae*, it is true in this case that "if the jury found that the defendant or another was responsible for the death in the commission of the felony, the jury by definition found that no extraordinary intervening cause existed that was the sole cause of the death." We conclude that the trial court did not err in its instructions to the jury.

(5) Sufficiency of Evidence

Finally, Beach argues that the State failed to present sufficient evidence to sustain the jury verdict of guilty for attempted second-degree murder based upon the shooting of Thomas. Beach relies on the inconsistent verdicts to support her position.

Initially, we note that Beach's inconsistency argument is different from the inconsistency as we used the term above. There is no element of the crime of attempted second-degree murder of Thomas that is identical to any of the elements with respect to the killing of Grant. Thus, our rejection of Beach's inconsistent verdict argument precludes Beach's reliance upon that theory in the context of the attempted second-degree murder.

In Count II, Beach was charged with attempted first-degree premeditated murder. The jury was also instructed to consider the lesser included offense of attempted second- degree murder:

"If you do not agree that the defendant is guilty of an attempt to commit the crime of murder in the first degree, you should then consider the lesser included offense of an attempt to commit the crime of murder in the second degree.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant performed an act toward the commission of the crime of murder in the second degree;

"2. That the defendant did so with the intent to commit the crime of murder in the second degree;

"3. That the defendant failed to complete commission of the crime of murder in the second degree; and

"4. That this act occurred on or about the 23rd day of June, 2000, in Wyandotte County, Kansas.

"The elements of murder in the second degree are as follows:

"1. That the defendant intentionally killed Margaret Thomas; and

"2. That this act occurred on or about the 23rd day of June, 2000, in Wyandotte County, Kansas."

The trial court, on two separate pages, gave the jury two instructions on the aiding and abetting theory:

"A person who, either before or during its commission, intentionally aids or abets another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

"A person who intentionally aids or abets another to commit a crime is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the other crime was reasonably foreseeable."

Beach argues that there is nothing in the evidence to establish that Beach shared the intent of Arevalo in shooting Thomas or participated in that act. However, the evidence presented to the jury was that Beach met with Arevalo and Zugelder to plan the murder of Grant. According to Zugelder, Beach made it clear at the meeting that Grant should die during the plan because she feared Grant's retaliation if he were to survive. However, on the day of the shooting, Grant had a companion, Thomas. Beach, who intentionally aided or abetted Arevalo in the killing of Grant, is responsible for the attempted killing of Thomas because that crime was foreseeable. See K.S.A. 21-3205(2). When Beach met Grant

and saw that he was with Thomas, it was foreseeable to her that Thomas would meet the same fate as Grant. Further, the testimony of Beach's jail cellmate indicates Beach believed Grant's companion was going to be killed.

Beach cites *State v. Green,* 237 Kan. 146, 147-48, 697 P.2d 1305 (1985), for the proposition that mere presence cannot establish liability upon an aiding and abetting theory. In *Green,* there was no evidence that the defendant willfully furthered the success of the venture. 237 Kan. at 149. Viewing the evidence in the light most favorable to the prosecution, the same cannot be said in this present case. Beach was an active participant in the scheme to kill Grant, and when she saw that Thomas was with Grant, it was foreseeable to her that Thomas would be harmed as well. Under our standard of review we conclude that the State presented sufficient evidence to sustain Beach's conviction of attempted second-degree murder.

Affirmed.

ABBOTT, J., not participating.

LARSON, S.J., assigned■