NOT DESIGNATED FOR PUBLICATION

No. 115,771

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ERIC A. TODD,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; TERRY L. PULLMAN, judge. Opinion filed August 25, 2017. Affirmed.

*Carl F.A. Maughan*, of Maughan & Maughan LC, of Wichita, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before HILL, P.J., MCANANY and ATCHESON, JJ.


PER CURIAM: An adage teaches that seeing is believing. And in keeping with that expression, conventional wisdom says jurors give great weight to witnesses who testify they saw the crime as it happened and point to the defendant in the courtroom as the person who did it. But that sort of eyewitness identification can be susceptible to all kinds of influences. Defendant Eric A. Todd challenges the jury verdict convicting him of felony theft as if it were based on such eyewitness identifications tainted by a show-up in which police presented him in handcuffs to two victims minutes after the crime. Although

1

there was a show-up, the victims never claimed to be able to identify Todd as the thief and never did. So in this case, the show-up can't be a basis for reversing the conviction.

Todd also claims the evidence the State marshalled against him at trial was insufficient as a matter of law to support the guilty verdict. The case, though circumstantial, was more than adequate to warrant the jury's conclusion. We, therefore, affirm the judgment of conviction.

FACTUAL AND PROCEDURAL HISTORY

On an afternoon in May 2015, Randal and Elizabeth Butcheck were at home—an apartment in a four-plex in Wichita—when Elizabeth casually looked out the backdoor. She saw someone pushing her son's bicycle along a walkway near the detached garage and storage area the residents of the building shared. Elizabeth shouted at the man to stop. But he jumped on the bicycle and pedaled away.

Alerted by the shouting, Randal checked on his wife, who told him what was happening. Randal saw the man riding off, so he grabbed a telephone and dialed 911. He handed the telephone to Elizabeth. He then jumped on his own bicycle and went after the man. But Randal couldn't catch up.

Elizabeth described the bicycle thief to the 911 dispatcher as a man with a slender build wearing khaki pants and a black hoodie with the hood up over his head. She also told the dispatcher the man had a black trash bag slung over his shoulder. Elizabeth never got a look at the man's face. Randal later gave a similar description to the police. He, too, did not see the man's face.

Wichita Police Officer Charles Byers was in the vicinity completing a report on another matter. A few minutes after receiving the dispatch report of the possible burglary,

Byers saw a thin man wearing a black hoodie and khaki pants walking down the street. The man carried a black trash bag. Officer Renay Bryand drove up. With Bryand as backup, Byers stopped the man, arrested him, and put him in handcuffs. Byers was able to identify his suspect by name as Todd.

Bryand contacted the Butchecks and took statements from them. Meanwhile, Byers, with Todd in tow, parked his patrol car nearby. He had Todd, still in handcuffs, stand in the street near the police car. Elizabeth and Randal told the police Todd's clothing and build matched those of the man who took their son's bicycle. They did not, however, positively identify Todd based on his facial characteristics, since neither of them had gotten a face-to-face look at the culprit.

Randal examined the items removed from the trash bag and couldn't immediately identify any of them. He later told the police another of his bicycles was missing a taillight that matched one of the objects Todd had. The resident of another apartment in the four-plex identified items in Todd's bag as possessions she had stored in the garage.

The district attorney's office ultimately charged Todd with burglary, a felony violation of K.S.A. 2016 Supp. 21-5807(a)(2), and with theft, a felony violation of K.S.A. 2016 Supp. 21-5801(a)(1) based on Todd's past conviction for theft, see K.S.A. 2016 Supp. 21-5801(b)(6). Todd filed a motion to keep the jury from hearing about the show-up when the officers displayed him to the Butchecks right after his arrest and to keep either of the Butchecks from making any in-court identification of him during the trial. The district court denied the motion.

During the 2-day trial in November 2015, the jurors heard testimony from the Butchecks, the other resident of the four-plex who had property taken, Officer Byers, and Officer Bryand. Todd did not testify in his own defense and offered no other evidence. Neither Elizabeth nor Randal made an in-court identification of Todd as the man who

took their son's bicycle and rode off with the trash bag of loot. Each of them essentially testified that the man the police asked them to look at had the same physique as the thief and wore the same kind of clothing. The officers told the jurors how they spotted a man named Eric Todd, stopped him, and then took him to the Butchecks' residence. Each officer then identified Todd, who was seated in the courtroom, as the man they had taken into custody. The jury found Todd not guilty of burglary and guilty of theft. The district court later sentenced Todd. Todd has appealed.

LEGAL ANALYSIS

*Challenge to Show-up*

For his first issue on appeal, Todd challenges the denial of his motion to keep out evidence of the show-up and to bar any in-court identification of him by the Butchecks. As we explain, the typical concerns about show-ups don't come into play here because the Butchecks didn't make what are commonly considered eyewitness identifications of Todd. So the point doesn't suggest (let alone demonstrate) Todd received something less than a fair trial. See *State v. Cruz*, 297 Kan. 1048, 1075, 307 P.3d 199 (2013) ("As we have recognized for decades, '[a] defendant is entitled to a *fair* trial but not a perfect one[.]'") (quoting *State v. Bly*, 215 Kan. 168, 178, 523 P.2d 397 [1974]).

A show-up—one person displayed by law enforcement to a witness—as contrasted with a well-configured lineup or photo array of five or six similar subjects is inherently suggestive and has been frequently criticized. See *Stovall v. Denno*, 388 U.S. 293, 302, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967) ("The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."); *State v. Lawson*, 25 Kan. App. 2d 138, Syl. ¶ 3, 959 P.2d 923 (1998) ("Absent exigent circumstances, the use of one-person show-ups by law enforcement is condemned."); *State v. Henderson*, 208 N.J. 208, 261, 27 A.3d 872 (2011) ("showups,

4

while sometimes necessary, are inherently suggestive"); *Long v. State*, No. 102,909, 2011 WL 434014, at *3 (Kan. App. 2011) (unpublished opinion) ("A show-up . . . is inherently suggestive."). If a defendant challenges a show-up, the district court asks whether the process was "impermissibly suggestive" and, if so, whether it "led to a substantial likelihood of misidentification." *State v. Trammell*, 278 Kan. 265, Syl. ¶ 2, 92 P.3d 1101 (2004) (considering general standard for testing out-of-court identification in context of photo array); *State v. Hunt*, 275 Kan. 811, 815, 69 P.3d 571 (2003) (applying standard to show-up). An impermissible show-up implicates a criminal defendant's due process rights protected in the Fourteenth Amendment to the United States Constitution. *Stovall*, 388 U.S. at 301-02; *Hunt*, 275 Kan. at 813.

In determining whether there has been an improper out-of-court identification, the district court must assess the totality of the circumstances surrounding the procedure guided by consideration of: (1) the witness' opportunity to see the perpetrator at the time of the original event; (2) the degree of attention the witness paid to the event and any reasons prompting the witness to make a particular effort to remember those observations; (3) the accuracy of any description the witness gave before the show-up; (4) the lapse of time between the initial observations and the show-up; (5) the mental and physical abilities of the witness to observe, retain, and recount the event; and (6) circumstances indicative of police prompting or suggestiveness. *Trammell*, 278 Kan. at 270-71; *Hunt*, 275 Kan. at 815-18. An appellate court looks at the determination using the well-known bifurcated standard that asks whether findings of fact have substantial support in the record and accords unlimited review to legal conclusions based on those findings. *Hunt*, 275 Kan. at 813. An out-of-court identification process may be so unduly and exceptionally suggestive under the circumstances as to taint any potential in-court identification by the witness. *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968) (admission of in-court identification of defendant may be reversible error when pretrial identification process "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification"); *United*

*States v. Douglas*, 525 F.3d 225, 242 (2d Cir. 2008) (*Simmons* standard applied to photo array); *Conner v. Poole*, 440 Fed. Appx. 29, 31 (2d Cir. 2011) (unpublished opinion) (*Simmons* standard applied to show-up).

Those legal principles are aimed at situations in which a witness asserts he or she can make a positive identification of a criminal suspect by recognizing the suspect's facial characteristics. In other words, the witness says at a show-up or in court, "I saw the person who committed the crime, and that person is the one in front of me now." That sort of eyewitness identification presents direct evidence of the suspect's guilt. And it can be powerful precisely because jurors often assume that what witnesses have sworn they've seen should be believed. See *Dennis v. Secretary, Pennsylvania Department of Corrections*, 834 F.3d 263, 341 (3d Cir. 2016) (McKee, C.J., concurring) (suggesting "limited utility of a bare bones jury instruction" on eyewitness identification "given the powerful countervailing effect of jurors' predisposition to believe eyewitness testimony"); *United States v. Smith*, 621 F. Supp. 2d 1207, 1209 (M.D. Ala. 2009); *State v. Artis*, 314 Conn. 131, 155-56, 101 A.3d 915 (2014) (acknowledging "the powerful effect that eyewitness identification testimony has on juries" but declining to treat its wrongful admission as structural error); *State v. Body*, 366 S.W.3d 625, 628 (Mo. App. 2012) (noting especially "persuasive value" of eyewitness identification). Show-ups can create significant potential problems with that sort of direct eyewitness evidence.

First, the very circumstance of law enforcement officers displaying a single individual to a witness implies the officers have good reason to believe the individual was involved in the crime being investigated. Otherwise, they would seem to be engaging in a pointless exercise. The implication may be strengthened if, as here, the individual is wearing handcuffs during the show-up. A witness' otherwise qualified or equivocal identification may be hardened to certainty or nearly so on the supposition the police have independent evidence of the suspect's guilt. That's a component of the procedure's inherent suggestiveness. See *State v. Herrera*, 187 N.J. 493, 504, 902 A.2d 177 (2006)

6

(show-up inherently suggestive because witness "can only choose from one person" who generally "is in police custody"); *State v. Dubose*, 285 Wis. 2d 143, 167-68, 699 N.W.2d 582 (2005) (show-ups conducted with suspects handcuffed or in police cars "carry with them inferences of guilt"). Also troubling, eyewitnesses may base their identifications of suspects in show-ups "more on similar distinctive clothing than on similar facial features." *Henderson*, 208 N. J. at 260.

Second, a show-up may have a deleterious effect on a witness' later identification of the suspect. The show-up process typically imprints in the witness' conscious and subconscious memory the facial features of the person law enforcement officers have presented for identification. Those memories may distort or supplant what the witness recalls from originally seeing the perpetrator of the crime. Months later, the witness' in-court identification of the defendant—the person in the show-up—may be heavily based on memories retained from the show-up rather than of the original incident. In its exhaustive opinion in *Henderson*, the New Jersey Supreme Court delved into modern studies and science on eyewitness identification and, among its many conclusions, recognized:  "[S]uccessive views of the same person can make it difficult to know whether the later identification stems from a memory of the original event or a memory of the earlier identification procedure." 208 N. J. at 255.

The courts recognize show-ups to be a useful investigatory tool, particularly if they are conducted shortly after the crime when the witnesses' recollections are fresh. Should law enforcement officers be unsure their suspect committed the crime, a show-up provides an immediate opportunity for an eyewitness to say the *wrong* person has been apprehended. The officers can then release their suspect and continue looking for the actual perpetrator. See *Stovall*, 388 U.S. at 302; *Long v. United States*, 156 A.3d 698, 708 (D.C. 2017); *Long*, 2011 WL 434014, at *4.

7

Whatever the drawbacks of show-ups, those limitations potentially affect direct evidence from eyewitnesses—people who identify the defendant in court as the individual they saw participate in criminal activity. But we don't have that here. Neither Elizabeth nor Randal ever made an eyewitness identification of Todd as the man who stole their son's bicycle. So they never provided any direct evidence of Todd's guilt. Rather, they offered circumstantial evidence with their description of the clothing and build of the criminal and the black trash bag he carried. That information was consistent with Todd's attire, physique, and chosen carryall, prompting the police to stop him in the vicinity of the Butchecks' home minutes after the crime.

In short, the Butchecks never purported to be able to make eyewitness identifications of Todd as the criminal. And they never did identify him in that manner. Under the circumstances, the show-up was not unduly or even particularly suggestive—it could not have influenced an eyewitness identification of Todd either then or at trial. Accordingly, the district court properly denied the motion to exclude the Butchecks' statements at the show-up that the man the police displayed wore the same type of clothing and had the same build as the man who stole their son's bicycle. Likewise, the district court properly permitted the Butchecks to testify at trial about the thief's clothing and physique and that the police had them look at a man who matched their limited description of the thief.

*Sufficiency of the Evidence*

For his second issue, Todd contends there was insufficient evidence to support the jury's verdict convicting him of theft. In reviewing a sufficiency challenge, we construe the evidence in a light most favorable to the party prevailing below, here the State, and in support of the jury's verdict. An appellate court will neither reweigh the evidence generally nor make credibility determinations specifically. *State v. Williams*, 299 Kan. 509, 525, 324 P.3d 1078 (2014); *State v. Pham*, 281 Kan. 1227, 1252, 136 P.3d 919

8

(2006). Our inquiry simply asks whether rational jurors could have found the defendant guilty beyond a reasonable doubt. *State v. McBroom*, 299 Kan. 731, 754, 325 P.3d 1174 (2014). The answer here is a straightforward yes.

To establish the theft charge, the State had to present evidence showing Todd exercised "unauthorized control" over property with the intent to permanently deprive the owner of "possession, use, or benefit" of that property and that the crime happened in Sedgwick County. K.S.A. 2016 Supp. 21-5801(a)(1). The elements of even the most serious crime can be proved through circumstantial evidence alone. *State v. Jefferson*, 297 Kan. 1151, 1167, 310 P.3d 331 (2013). And the jurors may rely on logical inferences drawn from those circumstances. 297 Kan. at 1167.

Here, the trial evidence showed the crime occurred in Sedgwick County. Todd's identity was established through circumstantial evidence. The Butchecks saw the thief ride off and described his build, what he was wearing, and that he had a black trash bag. As we have said, police officers stopped Todd near the crime scene within minutes precisely because he matched that description. The police found property belonging to the Butchecks and the other tenant of the apartment building in the trash bag. All of that presented strong circumstantial evidence that Todd was the thief. The Butchecks and the other tenant testified at trial that they did not give Todd permission to take their property. That was undisputed. The jury, in turn, could reasonably infer that Todd hadn't simply borrowed the items without permission and harbored some intention of returning them.

Without belaboring the issue, the jury heard ample evidence to convict Todd of theft. In his brief, Todd mentions the jury's decision to acquit him of the burglary. A split verdict, convicting a defendant of some charges and acquitting of others, is within a jury's prerogative. But such an outcome does not itself call into question the validity of the convictions. See *State v. Beach*, 275 Kan. 603, 622, 67 P.3d 121 (2003); *State v.*

*Hargrove*, 48 Kan. App. 2d 522, 559-60, 293 P.3d 787 (2013). Todd has offered nothing more, so the burglary verdict does not legally undercut the theft verdict.

Affirmed.