IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 111,785

STATE OF KANSAS,
*Appellee*,

v.

KYLE R. BELTZ,
*Appellant*.

SYLLABUS BY THE COURT

1.

Felony murder contains two causation elements. First, the death must lie within the res gestae of the underlying crime. Second, there must be a direct causal connection between the felony and homicide, which exists unless an extraordinary intervening event supersedes the defendant's act and becomes the sole legal cause of death.

2.

Criminal violence that erupts during a sale of drugs is not an extraordinary intervening event. Such violence, when deadly, cannot supersede a defendant's criminal participation in the sale and will not cut off his or her criminal liability for felony murder.

3.

The exceptions set forth in K.S.A. 2015 Supp. 21-5226(c)(1) and (2) are only available pursuant to subsection (c). There are no exceptions applicable to subsections (a) and (b).

Appeal from Sedgwick District Court; GREGORY L. WALLER, judge. Opinion filed January 27, 2017. Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.:  A jury convicted Kyle Beltz of first-degree felony murder for the killing of Ronald Betts during an attempted distribution of marijuana. We affirm his convictions.

FACTUAL AND PROCEDURAL BACKGROUND

Ronald Betts suffered multiple gunshot wounds during a botched drug deal, which resulted in his death. A jury convicted Betts' partner, Kyle Beltz, of felony murder for Betts' death during the attempted drug sale. Betts knew and was on good terms with both Beltz and Beltz' girlfriend, Kelly Touchton. Beltz and Touchton lived together, and Betts would occasionally use their home—which contained a marijuana grow operation—and the adjacent parking lot as a staging ground to sell marijuana.

On April 17, 2013, another acquaintance of Betts, Kyler Carriker, sent a text message to Beltz telling him that he wanted to purchase marijuana. Beltz put Carriker in touch with Betts, and the deal was set to occur the following day outside the Beltz/Touchton residence. Betts' wife, Jennifer, testified that on April 18, 2013, Betts left

2

their house saying he was going to Beltz' home to meet some people and make a deal. She stated that she saw the marijuana Betts took to sell that night.

Touchton testified that at around 6 or 7 p.m. on April 18, Beltz and Carriker left the Beltz/Touchton residence to run an errand in Carriker's truck. While they were gone, Betts arrived at the house. Touchton let Betts inside and went down to the basement to organize her art supplies. Later that evening, Touchton heard her dogs barking and returned to the main floor to investigate the cause. She saw Betts and Carriker come in the front door with three men she did not recognize, who were later identified as Lorenzo Spires, Dennis Haynes, and John Carter. She did not see Beltz. Touchton assumed Betts and Carriker were conducting a drug deal with the three unknown men, and she noticed that everyone was "acting so stiff." Touchton knew that Carriker and Betts each carried a gun and that Beltz kept a shotgun in the house.

When Touchton went to the kitchen to get some ice, she heard several high-pitched gunshots and fell to the ground beside the refrigerator. She heard both the high-pitched gunshots and the sound of a shotgun firing. Shortly thereafter, Touchton saw one of the three strangers enter the kitchen and point a gun at her. She heard a click and saw the man leave the kitchen. The man eventually returned and pulled her away from the back door, saying "move, bitch." Touchton crawled to the bathroom and hid until the firing ceased.

When the gunshots stopped, Touchton heard Beltz call out for Carriker. She came out of hiding and saw Carriker lying on the bedroom floor bleeding from his leg. Carriker said they had shot him and taken his gun. Betts was lying motionless on the living room floor. Spires, Haynes, and Carter were gone. When Beltz told Touchton to call the police, Carriker fled the house.

3

Touchton testified that Beltz later told her Carriker had met the men interested in purchasing the marijuana and Carriker had contacted him to ask where he could buy the drugs. Beltz then contacted Betts, putting him in contact with Carriker. Beltz told Touchton that it was a deal between Betts and Carriker and that it was supposed to happen in front of a store beside their house rather than inside the house. Beltz explained that his role was "to look out for [Betts and Carriker] and make sure that they were okay, that they didn't get robbed or nothing went wrong."

Beltz told police that he had been in the master bedroom when the shooting began. Beltz then grabbed his shotgun and went to a closet that connected the master bedroom and the front bedroom. When someone looked into the closet from the front bedroom, Beltz fired twice in that direction and then stumbled or fell backwards into the master bedroom. When Beltz heard someone outside the room, he fired one shot at the door separating the master bedroom and the living room and retreated to hide by the bed.

The forensic pathologist who conducted Betts' autopsy testified that Betts was shot five times. Of the three gunshot wounds that contributed to his death, two were caused by handguns and one was from a shotgun. The shotgun wound was located on Betts' upper left abdomen, and the pellets perforated areas of the body including the left kidney, spleen, and lower left lobe of the lung.

A jury convicted Beltz of attempted possession of marijuana with the intent to distribute and first-degree felony murder for the killing of Betts during the attempted distribution of marijuana. The district court sentenced Beltz to a hard 20 life sentence for the felony murder and 67 months for the attempted distribution, running concurrently with the life sentence. Beltz appealed directly to this court.

ANALYSIS

Beltz raises four issues on appeal. First, Beltz asserts that the district court erred by allowing the State to present evidence that he was growing marijuana in his basement as well as evidence of prior sales by Betts at or near his house. Beltz then argues that the district court should have granted his motion for acquittal because there was not a direct causal connection between the sale of marijuana and Betts' death. Third, he claims that his proposed self-defense instruction was legally and factually appropriate. Finally, he asserts that the State presented a case in which the jury could have found that multiple acts constituted the aiding and abetting of the attempted distribution of marijuana. We consider and reject each argument in turn.

*Beltz has waived or abandoned his challenge to the K.S.A. 2015 Supp. 60-455 evidence.*

K.S.A. 60-404 generally precludes an appellate court from reviewing an evidentiary challenge absent a timely objection made on the record. See *State v. Bowen*, 299 Kan. 339, 351, 323 P.3d 853 (2014). Consistent with this statute, our rules require appellants to include in their briefs a pinpoint reference to the record indicating where the issue was raised and ruled on below. Supreme Court Rule 6.02(a)(5) (2015 Kan. Ct. R. Annot. 41). Although exceptions to this general rule exist, parties seeking to raise an issue for the first time on appeal must assert the exceptions. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015); Supreme Court Rule 6.02(a)(5) (directing parties who wish to raise an issue for the first time on appeal to explain why the issue is properly before this court).

Here, Beltz did not lodge a contemporaneous objection to the evidence of the marijuana grow. Beltz did object to Touchton's testimony that Betts regularly sold marijuana in the parking lot beside the Beltz/Touchton house. Later in the trial, however, Beltz did not object to testimony from a detective who stated that Beltz had told him

5

Betts had previously sold marijuana at the house. Beltz also failed to object to Jennifer Betts' testimony that on a prior occasion, she witnessed Betts go inside the house to sell marijuana.

Beltz asserts that he objected to the admission of the contested evidence at trial, but he does not provide any citation to the record to support this claim. "Rule 6.02(a)(5) means what it says and is ignored at a litigant's own peril." *Godfrey*, 301 Kan. at 1043. Since Beltz did not preserve his objection to the evidence relating to the marijuana grow, and because he has not attempted to explain why we should consider the issue for the first time on appeal, we deem this claim waived.

With respect to evidence of prior marijuana sales at or near Beltz' house, while Beltz did object to Touchton's testimony on this subject, we cannot reverse on this basis because similar testimony that served the same purpose was admitted without objection.

> "On the record before us, however, even if we assume that the admission was erroneous under K.S.A. 60-455, we could not reverse on that basis. Other testimony, not challenged by [defendant] on appeal, was bound to inflict the same or greater damage than that inflicted by [the witness'] testimony on the defense case." *State v. Barber*, 302 Kan. 367, 375, 353 P.3d 1108 (2015).

See *In re Care & Treatment of Thomas*, 301 Kan. 841, 843-45, 348 P.3d 576 (2015) (finding that offender failed to preserve his challenge to the foundation for admission of nursing notes where he initially objected, the State responded by providing additional foundation evidence, and then the offender neglected to object again before the evidence was admitted). Hence, Beltz' initial objection was abandoned, and his claim has not been properly preserved for appellate review.

6

*There was a sufficient causal relationship between Betts' death and the attempted sale of marijuana.*

Next, Beltz argues the district court erred in denying his motion for acquittal because there was not a sufficient causal relationship between the attempted sale of marijuana and Betts' death. Beltz asserts that the actions of Spires, Haynes, and Carter caused the death rather than the attempted sale of marijuana.

> "In considering the trial court's decision to deny [a defendant's] motion for acquittal, we consider all the evidence in the light most favorable to the prosecution and determine if a rational factfinder could have found the defendant guilty beyond a reasonable doubt. [Citation omitted.] In doing so, we do not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. [Citations omitted.]" *State v. Llamas*, 298 Kan. 246, 254, 311 P.3d 399 (2013).

Felony murder is the killing of a human being "in the commission of, attempt to commit, or flight from an inherently dangerous felony." K.S.A. 2015 Supp. 21-5402(a)(2). Distribution of a controlled substance is included in the statutory list of inherently dangerous felonies. K.S.A. 2015 Supp. 21-5402(c)(1)(N). Beltz contests the causal connection between his attempted distribution and the felony murder.

> "In order to establish felony murder, the State must prove two causation elements. First, the death must lie within the res gestae of the underlying crime, which is defined in this context as acts committed before, during, or after the happening of the principal occurrence, when those acts are so closely connected with the principal occurrence as to form, in reality, a part of the occurrence. Second, the felony and the homicide must have a direct causal connection, which exists unless an extraordinary intervening event supersedes the defendant's act and becomes the sole legal cause of death. [Citation omitted.]" *State v. Cameron*, 300 Kan. 384, 396-97, 329 P.3d 1158 (2014).

7

Beltz presents no argument regarding the res gestae element. See *State v. Littlejohn*, 298 Kan. 632, 655-56, 316 P.3d 136 (2014) (An issue not briefed by the appellant is deemed waived and abandoned.). We have no difficulty concluding that the State has established the first causation element because Betts' death occurred either during or within minutes after the attempt to sell the marijuana to Spires, Haynes, and Carter.

Once it has been determined that the death lies within the res gestae of the underlying crime, as here, the direct causal connection can only be severed by an extraordinary intervening event. The instant facts are similar to those in *State v. Beach*, 275 Kan. 603, 67 P.3d 121 (2003). In *Beach*, the defendant was convicted of felony murder based on the underlying felony of selling methamphetamine. Beach arranged the sale, drove the victim to the house where the sale was supposed to occur, and took the victim's money into the house to allegedly purchase drugs, leaving the victim and a passenger in the vehicle. While the sale was transpiring, Beach's partner shot and killed the victim, apparently planning to rob him.

Beach argued the State had failed to present a direct causal connection between the killing and the sale of methamphetamine because her partner's actions—the robbery—were an extraordinary intervening event. The *Beach* court explained that the robbery was not an extraordinary intervening event because by participating in the sale of methamphetamine, Beach had knowingly created a foreseeable target of a violent crime. Thus, the court found that a direct causal connection existed between the sale of methamphetamine and the killing. 275 Kan. at 613-14.

Similarly, in *State v. Jackson*, 280 Kan. 541, 124 P.3d 460 (2005), the defendant acted as an intermediary in the sale of cocaine. During the course of the drug

8

transaction—at which the defendant was present—a fight ensued between the principal parties to the sale, resulting in the death of the purchaser. On appeal, Jackson argued that the supplier's act of shooting the purchaser was an extraordinary intervening event. Employing the same analysis used in *Beach*, we rejected the claim. 280 Kan. at 548-49 ("[The defendant] also acknowledged that selling drugs is a dangerous business and that most people carry guns to protect themselves during drug transactions.").

Beltz briefly cites to *State v. Bryant*, 276 Kan. 485, 78 P.3d 462 (2003), to support his position. However, the *Byrant* line of cases do not help Beltz because they simply stand for the proposition that "the felony-murder rule does not apply when the *lawful acts* of either a law enforcement officer or a victim of a crime cause the death of a co-felon." *Bryant*, 276 Kan. at 490.

Our precedent is clear. Criminal violence that erupts during a drug sale is not an extraordinary intervening event. Such violence, when deadly, cannot supersede a defendant's criminal participation in the sale and will not cut off his or her criminal liability for felony murder. As such, Beltz' claim on appeal must fail. The district court correctly denied Beltz' motion for acquittal.

*Beltz was not entitled to a self-defense instruction.*

Beltz argues that the district court erroneously denied his requested self-defense instruction pursuant to K.S.A. 2015 Supp. 21-5226. We review alleged jury instruction errors using the following framework:

> "When reviewing the failure to give a lesser included instruction, (1) first, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court

9

should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless." *State v. Soto*, 301 Kan. 969, Syl. ¶ 9, 349 P.3d 1256 (2015).

The State argues that because Beltz asserts new legal reasoning to support the instruction, the issue should be treated as if raised for the first time on appeal and subject to the clear error standard. But Beltz' claim is rooted entirely in his interpretation of K.S.A. 2015 Supp. 21-5226, which was the law at issue below and, therefore, not new to the discussion. We conclude Beltz properly preserved his claim but find no error.

Resolution of the issue turns on whether a self-defense instruction in this case was legally appropriate. "A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force." K.S.A. 2015 Supp. 21-5222(a). "Self-defense [is] based on justification or excuse and operates as a complete defense to a crime, and requires both an objective and subjective analysis." *State v. Phillips*, 295 Kan. 929, 939, 287 P.3d 245 (2012). However, self-defense is not available to all defendants. 295 Kan. at 939. K.S.A. 2015 Supp. 21-5226 provides the relevant limit to self-defense in this case:

"The justification described in K.S.A. 21-3211, 21-3212 and 21-3213, prior to their repeal, or K.S.A. 21-5222, 21-5223 and 21-5225, and amendments thereto, is not available to a person who:

"(a) Is attempting to commit, committing or escaping from the commission of a forcible felony;

10

"(b) initially provokes the use of any force against such person or another, with intent to use such force as an excuse to inflict bodily harm upon the assailant; or

"(c) otherwise initially provokes the use of any force against such person or another, unless:

(1) Such person has reasonable grounds to believe that such person is in imminent danger of death or great bodily harm, and has exhausted every reasonable means to escape such danger other than the use of deadly force; or

(2) in good faith, such person withdraws from physical contact with the assailant and indicates clearly to the assailant that such person desires to withdraw and terminate the use of such force, but the assailant continues or resumes the use of such force."

The initial question is whether the attempted sale of marijuana is a "forcible felony" pursuant to K.S.A. 2015 Supp. 21-5226(a). Notably, Beltz offers no argument on appeal that the attempted sale of marijuana was not a forcible felony. We have consistently found that the sale of drugs under similar circumstances is a forcible felony. See *Bryant*, 276 Kan. at 491; *State v.Mitchell*, 262 Kan. 687, 696, 942 P.2d 1 (1997); see also *State v. Ackward,* 281 Kan. 2, 24-26, 128 P.3d 382 (2006); *State v. Jacques*, 270 Kan. 173, 180-81, 14 P.3d 409 (2000). As in these cases, the sellers here—Betts, Beltz, and Carriker—all carried firearms when they sold drugs because they were aware of the "threat of physical force or violence" inherent in their line of work. See K.S.A. 2015 Supp. 21-5111(n).

Rather than argue that the attempted distribution charge was not a forcible felony, Beltz contends that the retreat "safe harbor" exceptions in K.S.A. 2015 Supp. 21-5226(c)(1) and (2) apply to subsections (a) and (b), and not—as the State maintains—to

11

subsection (c) only. Reviewing courts exercise plenary review over questions of statutory interpretation. *State v. Brown*, 298 Kan. 1040, 1057, 318 P.3d 1005 (2014).

> "The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. When a statute is plain and unambiguous, an appellate court does not speculate as to the legislative intent behind it and will not read into the statute something not readily found in it. Where there is no ambiguity, the court need not resort to statutory construction." *State v. Jolly,* 301 Kan. 313, Syl. ¶ 2, 342 P.3d 935 (2015).

We conclude the plain language of K.S.A. 2015 Supp. 21-5226 demonstrates that the retreat safe harbor exceptions contained in subsections (c)(1) and (2) are only available to a defendant falling under subsection (c). The State points out that the format of the statute, with (c)(1) and (c)(2) being subsections only to subsection (c), by itself shows that they were meant only as exceptions to subsection (c).

Not only does the format of the statute support this conclusion, so does a comparison of the language of subsections (b) and (c). Both subsections prohibit self-defense when a person "initially provokes the use of any force against such person or another." K.S.A. 2015 Supp. 21-5226(b), (c). However, subsection (b) includes the additional element that the initial provocation be done "with intent to use such force as an excuse to inflict bodily harm upon the assailant." K.S.A. 2015 Supp. 21-5226(b). Interpreting the statute as Beltz suggests would clearly read the distinction between subsections (b) and (c) out of the law, making subsection (b) mere surplusage. See *State v. Sellers*, 301 Kan. 540, 547, 344 P.3d 950 (2015) (explaining that courts presume that the legislature does not intend to enact useless or meaningless legislation).

It is plain to us that the retreat safe harbor provisions contained in K.S.A. 2015 Supp. 21-5226(c)(1) and (2) are not available to defendants meeting the descriptions

12

contained in subsections (a) and (b). Because Beltz is ineligible to claim self-defense pursuant to subsection (a), he is not entitled to rely on the retreat safe harbor provisions of subsection (c), and a self-defense instruction was not legally appropriate. The district court did not err by denying his requested self-defense instruction.

*The district court was not required to give a unanimity instruction.*

Finally, Beltz argues that the district court committed clear error by failing to give a unanimity instruction when the State argued multiple acts supported the charge of aiding and abetting the attempted sale of marijuana.

We have recently stated the framework for unanimity instruction analysis:

"'Unanimity instruction errors are reviewed under a three-part framework. First, the reviewing court determines whether a multiple acts case is presented. The threshold question is whether jurors heard evidence of multiple acts, each of which could have supported conviction on a charged crime. [Citation omitted.] This is a question of law subject to unlimited review. [Citations omitted.] If the case is a multiple acts case, the next question is whether error was committed. To avoid error, the State must have informed the jury which act to rely upon or the district court must have instructed the jury to agree on the specific act for each charge. Failure to elect or instruct is error. Finally, the court determines whether the error was reversible or harmless. [Citation omitted.] When, as here, the defendant failed to request a unanimity instruction, the court applies the clearly erroneous standard provided in K.S.A. 2013 Supp. 22-3414(3). [Citation omitted.] Under this test, to find the error reversible,

"'"[A]n appellate court must be firmly convinced that under the facts the jury would have returned a different verdict if the unanimity instruction had been given. [Citations omitted.]"'" *State v. Castleberry,* 301 Kan. 170, 185-86, 339 P.3d 795 (2014).

13

Beltz contends that the State presented evidence of three acts that could have constituted the aiding or abetting of the attempted sale of marijuana: (1) Beltz' role in connecting Betts and Carriker to arrange the sale; (2) Beltz allowing others to use his home to conduct the drug sale; (3) and Beltz functioning as a lookout or security for the drug sale. "When a case involves multiple acts, the jury must be unanimous in finding which specific act constitutes the crime." *State v. King*, 297 Kan. 955, 977, 305 P.3d 641 (2013). The threshold question is "whether the defendant's actions could have given rise to multiple counts of the charged crime or whether the alleged conduct was unitary." *State v. Trujillo*, 296 Kan. 625, 629, 294 P.3d 281 (2013). In *State v. De La Torre*, 300 Kan. 591, 598, 331 P.3d 815 (2014), we recently explained:

> "'Multiple acts' are legally and factually separate incidents that independently satisfy the elements of the charged offense. [Citations omitted.] Incidents are factually separate when independent criminal acts have occurred at different times or different locations or when a criminal act is motivated by a fresh impulse. Factually separate and distinct incidents are not unitary conduct. [Citation omitted.]"

The State did not present multiple acts independently satisfying the elements of the crime. All the acts Beltz has highlighted occurred within a 2-day window and all were done in support of the same criminal act—the attempted sale of marijuana. There was only one alleged attempted sale of marijuana, and the jury instructions clearly stated that this attempt occurred "on or about the 18th day of April." While Beltz may have made multiple overt acts in support of the attempted sale, the attempted sale of marijuana on April 18, 2013, was the only criminal occurrence. See *State v. Soto*, 299 Kan. 102, 111, 322 P.3d 334 (2014) (applying similar reasoning to multiple acts issue involving aiding and abetting first-degree murder); see also *State v. Kleypas*, 272 Kan. 894, 942, 40 P.3d 139 (2001) ("[T]he attempted rape charge at hand presents neither a multiple acts nor an alternative means situation. The possible overt acts need not themselves be illegal or chargeable as criminal offenses and, thus, this is not a multiple acts case.").

14

Because all Beltz' acts were in support of the single attempted sale, those facts could not have supported another conviction of the charged crime. Beltz fails to satisfy the threshold inquiry of showing multiple acts occurred, and, therefore, a unanimity instruction was not necessary.

Affirmed.