IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 122,961

STATE OF KANSAS,
*Appellee*,

v.

MICHAEL J. PEARCE JR.,
*Appellant*.

SYLLABUS BY THE COURT

1.

Felony murder is statutorily defined as the killing of a human being in the commission of, attempt to commit, or flight from any inherently dangerous felony. Distribution of a controlled substance is designated in the statute as an inherently dangerous felony.

2.

Felony murder contains two causation elements. First, the death must lie within the res gestae of the underlying crime. Second, there must be a direct causal connection between the felony and homicide, which exists unless an extraordinary intervening event supersedes the defendant's act and becomes the sole legal cause of death.

3.

Criminal violence that erupts during a sale of drugs is not an extraordinary intervening event. Such violence, when deadly, cannot supersede a defendant's criminal participation in the sale and will not cut off his or her criminal liability for felony murder.

4.

Section 5 of the Kansas Constitution Bill of Rights does not guarantee defendants the right to have a jury determine the existence of sentence-enhancing prior convictions under the revised Kansas Sentencing Guidelines Act.

Appeal from Miami District Court; AMY L. HARTH, judge. Opinion filed December 17, 2021. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause, and was on the brief for appellant.

*Jason A. Vigil*, assistant county attorney, argued the cause, and *Elizabeth H. Sweeney-Reeder*, county attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

STANDRIDGE, J.: This is Michael J. Pearce's direct appeal following his convictions for first-degree felony murder, criminal threat, and distribution of methamphetamine. Pearce challenges his felony-murder conviction, arguing that the State failed to establish a direct causal connection between his involvement in distributing drugs and the death of the victim. But contrary to Pearce's argument, there was no extraordinary intervening event that worked to sever the causal connection between the victim's death and Pearce's participation in the underlying felony of methamphetamine distribution. Pearce also argues the district court violated his common-law right to a jury trial under section 5 of the Kansas Constitution Bill of Rights by making judicial findings of his prior convictions to establish his sentence. But we recently rejected the same section 5 challenge to criminal history in *State v. Albano*, 313 Kan. 638, Syl. ¶ 4, 487 P.3d 750 (2021). For these reasons, we affirm Pearce's conviction and sentence.

FACTS

In the early morning hours of July 21, 2017, law enforcement was dispatched to the area of 311th Street and Lookout Road, a two-lane gravel road in Miami County between Osawatomie and Paola. Upon arrival, law enforcement discovered the body of Heather Briggs trapped underneath an SUV. Law enforcement contacted two individuals there:  David Rhoades, who was trying to lift up the SUV, and Nichole Razo, who was frantic and crying hysterically. Law enforcement later spoke with Curtis Cooley, who was walking nearby. Briggs was pronounced dead at the scene.

During the investigation, law enforcement identified and interviewed several other witnesses and discovered that Briggs' death occurred during a drug deal. Razo arranged through Cooley to purchase 7 grams of methamphetamine from Rhoades for $200. Razo and Rhoades agreed to meet on Lookout Road. Razo drove there in her SUV with Cooley, Seth Herron, and Kevin Stevens. April Lunsford drove another vehicle with Rhoades, Briggs, and Pearce as passengers. Upon arrival, Rhoades met with Razo and they exchanged the drugs and cash. A dispute then arose when both groups discovered they had received a lesser amount of drugs and money than agreed upon. Briggs and Pearce exited Lunsford's vehicle and argued with Razo through the driver's window of the SUV. The argument appeared to be resolved when Razo returned the drugs to Pearce, and he gave back her money. Razo then drove away, running over Briggs in the process. Lunsford called 911 and left the area with Pearce. Rhoades and Razo stayed and tried to lift the SUV off Briggs. Cooley, Stevens, and Herron ran from the scene; Cooley later returned after the emergency vehicles arrived.

The State filed charges against all of the above individuals for their involvement in the events leading to Briggs' death. All but Stevens entered into plea agreements with the

3

State that required them to testify against Pearce, who was charged with one count each of first-degree felony murder based on the underlying felony of distribution of methamphetamine, aggravated assault, criminal threat, and distribution of methamphetamine.

At Pearce's jury trial, the witnesses each testified about their recollection of the moments before Briggs' death. Herron testified that when the argument about the drugs and money broke out, Pearce pulled out a gun and waved it at Razo, stating: "'If the money doesn't show, I'm going to shoot you guys.'" Herron said that because of Pearce's threat, Razo drove off while Briggs was standing in front of the SUV. Herron claimed that as Razo drove away, he heard three gunshots. On cross-examination, Herron testified that shortly before Razo drove off, Razo told Briggs, "'Bitch, I'll run you over.'" But Herron maintained that Razo left because she was scared when Pearce pulled out the gun and that she was trying to get away.

Razo testified that when Pearce approached her vehicle and returned her money in exchange for the methamphetamine, he directed Briggs to weigh the drugs. Razo claimed that Pearce said, "'Don't mess with me; if my dope is short, I will shoot you.'" When asked whether Pearce made any movements like he had a gun, Razo said, "He was going underneath his shirt, but I didn't wait to find out if he had a gun or not." According to Razo, she told her passengers to put their heads down and "took off," only stopping after realizing that she had hit Briggs. Razo testified that she did not mean to run over Briggs and claimed that she only drove off because Pearce threatened to shoot up the car. Razo denied she threatened to run over Briggs.

Cooley testified that shortly before Razo ran over Briggs, he heard Pearce tell Razo, "'Don't do anything stupid, or I'll shoot the car up.'" Cooley said that everyone

4

panicked after the SUV stopped, and that he ran from the scene because he was afraid Pearce might start shooting.

Rhoades first testified that he did not see Pearce with a gun or make any movements suggesting that he had a gun. Rhoades also denied hearing any gunshots and denied that Pearce had been involved in the drug transaction. Rhoades claimed that the sound the other witnesses had identified as gunshots was actually the sound of him hitting the back of Razo's SUV with nunchucks to get her to stop. Rhoades later admitted that when Pearce exited Lunsford's vehicle, Pearce said, "'I got this,'" and grabbed his pants as though he might have a gun.

Lunsford testified that she did not see Pearce with a gun and that she never heard gunshots or saw anyone fire a weapon. According to Lunsford, Razo later admitted that she never saw a gun, but she thought Pearce was reaching for one. Lunsford denied that Pearce was involved in the drug deal or that he acted as an enforcer to the transaction.

Stevens, who had declined the State's plea offer and was found not guilty of criminal charges arising from Briggs' death, testified for the defense. Stevens testified that he was asleep in Razo's vehicle and woke up to her arguing with Briggs. Stevens said that Briggs beat on Razo's vehicle and told Razo to come out and fight her. Stevens claimed that as Briggs walked away, Razo "hit the gas," steered her car toward Briggs, and ended up hitting her. Stevens denied seeing Pearce at all during the incident and further denied seeing anyone with a gun, hearing anyone threaten to shoot the car, or hearing gunshots. On cross-examination, the prosecutor impeached Stevens with his prior testimony from his jury trial. There, Stevens testified that shortly before Razo ran over Briggs, he "heard someone say something about shooting up the car" and that he "heard a couple of loud bangs" that he thought came from a gun.

5

The jury found Pearce guilty of first-degree felony murder, distribution of methamphetamine, and criminal threat. The jury found him not guilty of aggravated assault. Based on the severity level of the crimes Pearce committed and his criminal history, the district court imposed a controlling sentence of 130 months plus life in prison.

Pearce filed this timely appeal.

ANALYSIS

Pearce raises two arguments on appeal. First, he argues the State failed to prove the causation required to establish his guilt for felony murder. Second, Pearce argues the use of his prior convictions to determine his sentence violated his jury trial rights under section 5 of the Kansas Constitution Bill of Rights. We address each argument in turn.

1. *Sufficiency of the evidence: felony-murder conviction*

Pearce challenges the sufficiency of the evidence supporting his felony-murder conviction, arguing that the State failed to prove a sufficient causal connection between his participation in the distribution of methamphetamine and Briggs' death.

At the outset, the parties disagree on the applicable standard of review. Citing *State v. Sophophone*, 270 Kan. 703, 704-06, 19 P.3d 70 (2001), Pearce claims that whether a defendant is subject to the felony-murder rule based on the causal relationship between the underlying felony and a victim's death is a question of law that is subject to unlimited review. But the State correctly points out that *Sophophone* addressed the specific legal issue of whether a defendant could be convicted of felony murder "for the killing of a co-felon not caused by his acts but by the lawful acts of a police officer acting in self-defense." See 270 Kan. at 705. Here, there is no similar question of law before us

6

because Pearce does not allege that Briggs' death resulted from a lawful act by a third party. See 270 Kan. at 706 ("[I]t is only because the act which resulted in the killing was a lawful one by a third party that a question of law exists as to whether Sophophone can be convicted of felony murder."). Instead, the standard of review for determining whether there is a causal connection between the underlying felony of distribution of methamphetamine and Briggs' death requires us to examine the sufficiency of the evidence. See *State v. Beach*, 275 Kan. 603, 611, 67 P.3d 121 (2003). The applicable standard of review is well known:

> "'When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses.'" *State v. Colson*, 312 Kan. 739, 749-50, 480 P.3d 167 (2021).

Felony murder is statutorily defined as the killing of a human being "in the commission of, attempt to commit, or flight from any inherently dangerous felony." K.S.A. 2020 Supp. 21-5402(a)(2). Distribution of a controlled substance is expressly designated in the statute as an inherently dangerous felony. See K.S.A. 2020 Supp. 21-5402(c)(1)(N); K.S.A. 2020 Supp. 21-5705(a)(1). Consistent with the statutory definition, the court instructed the jury that to find Pearce guilty of felony murder, the State had to prove that (1) "[t]he defendant or another killed Heather Briggs" and (2) "[t]he killing was done while defendant was committing, attempting to commit or fleeing from Distribution of Controlled Substances-Methamphetamine." As for the causation required to establish felony murder, this court has clarified:

> "The felony-murder statute requires two elements of causation. First, the death must occur within the res gestae of the underlying felony. Second, there must be a direct

7

causal connection between the felony and the homicide. Res gestae refers to acts that occurred 'before, during, or after the happening of the principal occurrence when those acts are so closely connected with the principal occurrence as to form, in reality, a part of the occurrence.' A direct causal connection exists unless an extraordinary intervening event supersedes the defendant's act and becomes the sole legal cause of death.

"There are three factors examined in determining whether a direct causal connection is present: time, distance, and the causal relationship between the underlying felony and the killing. [Citations omitted.]" *State v. Phillips*, 295 Kan. 929, 940-41, 287 P.3d 245 (2012).

In challenging the State's proof of causation, Pearce presents no argument on the res gestae element. See *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018) (An issue not briefed is deemed waived or abandoned.). And we easily conclude that the State established the first causation element because Briggs' death occurred either during or shortly after the drug transaction.

Turning to the second causation element, Pearce makes two arguments in which he disputes a direct causal connection between Briggs' death and his participation in the drug transaction. First, Pearce asserts that Razo's act of running over Briggs was the sole cause of Briggs' death and constituted an extraordinary intervening event which superseded any causal connection between her death and his involvement in the drug sale. Second, he contends that Razo's act of killing Briggs is not subject to the felony-murder rule because Razo was a buyer of the drugs and was therefore not a co-felon in distributing them.

a. *Extraordinary intervening event*

In evaluating causation in a felony-murder case, "[o]nce it has been determined that the death lies within the res gestae of the underlying crime, . . . the direct causal connection can only be severed by an extraordinary intervening event." *State v. Beltz*, 305 Kan. 773, 778, 388 P.3d 93 (2017). To determine whether an intervening event is extraordinary, we consider whether it was foreseeable. *State v. Nesbitt*, 308 Kan. 45, Syl. ¶ 3, 417 P.3d 1058 (2018) ("An intervening event does not qualify as extraordinary if it was foreseeable.").

Pearce argues that Razo's act of running over Briggs constituted an extraordinary intervening event that severed any connection between her death and his participation in the distribution of methamphetamine.

But this court has held that "[c]riminal violence that erupts during a drug sale is not an extraordinary intervening event. Such violence, when deadly, cannot supersede a defendant's criminal participation in the sale and will not cut off his or her criminal liability for felony murder." *Beltz*, 305 Kan. at 774-75, 779 (upholding felony-murder conviction stemming from drug shootout where victim was not intended target of robbery or shooting); see also *State v. Jackson*, 280 Kan. 541, 548-49, 124 P.3d 460 (2005) (drug supplier's act of shooting purchaser was not an extraordinary intervening event that superseded defendant's participation as intermediary in drug transaction); *Beach*, 275 Kan. at 613-14 (direct causal connection existed between sale of methamphetamine and victim's death during attempted robbery; robbery was not extraordinary intervening event because defendant had knowingly created foreseeable target of violent crime by participating in sale of methamphetamine).

9

This same rule holds true for a defendant who provokes a violent or defensive response by using or threatening to use a deadly weapon to commit a dangerous crime. See *State v. Wilson*, 308 Kan. 516, 526, 421 P.3d 742 (2018) ("Put simply, it is foreseeable that violence begets violence."); *State v. McClelland*, 301 Kan. 815, 823, 347 P.3d 211 (2015) ("[The defendant] set off a chain of violent events when he planned on robbing a house and brought a gun in furtherance of that plan."); *Phillips*, 295 Kan. at 942 ("[T]he causal relation is also satisfied because it is foreseeable that violence will erupt during an aggravated robbery in which the robber carries a gun. The very nature of an aggravated robbery is violent."); *Jackson*, 280 Kan. at 549 ("[The defendant] also acknowledged that selling drugs is a dangerous business and that most people carry guns to protect themselves during drug transactions.").

Pearce does not challenge the fact that he participated in the drug sale. Indeed, multiple witnesses testified that Pearce was directly involved in the dispute over the drugs and money. Several witnesses also testified that Pearce had a gun, Pearce could have had a gun, Pearce threatened to shoot up Razo's car, or that they heard gunshots. Razo claimed that she would not have driven the car into Briggs but for Pearce's threat to shoot up the car. For all of these reasons, Razo's act of hitting Briggs with her car did not constitute an extraordinary intervening event that broke the causal chain to become the sole cause of Briggs' death. Rather, it is foreseeable that the use or threatened use of a gun would also increase the potential for violence that already exists at a drug sale. See *Wilson*, 308 Kan. at 526 (finding it foreseeable that active shooter would "trigger the deeply embedded human fight or flight reflex," thereby causing deadly defensive action by others).

b. *Application of felony-murder rule*

Next, Pearce contends that Razo's act of killing Briggs is not subject to the felony-murder rule because Razo was buying, not selling, the drugs and was therefore not a co-felon to the charged underlying felony—the distribution of methamphetamine. As support for his argument, Pearce relies on this court's decisions in *Sophophone*, 270 Kan. 703, and *State v. Murphy*, 270 Kan. 804, 19 P.3d 80 (2001), *abrogated on other grounds by State v. Martin*, 285 Kan. 735, 175 P.3d 832 (2008).

Pearce's reliance on *Sophophone* and *Murphy* is misplaced. Those two cases stand for the legal proposition that "the felony-murder rule does not apply when the *lawful acts* of either a law enforcement officer or a victim of a crime cause the death of a co-felon." *State v. Bryant*, 276 Kan. 485, 490, 78 P.3d 462 (2003), *abrogated on other grounds by State v. Gleason*, 277 Kan. 624, 88 P.3d 218 (2004); see *Sophophone*, 270 Kan. at 712-13 (law enforcement action causing death); *Murphy*, 270 Kan. at 809 (victim action causing death). Pearce does not allege that Razo's act of running over Briggs was lawful. And Razo is neither a law enforcement officer nor a victim under these circumstances. Although the State charged Pearce with criminal threat based on his alleged threats to shoot Razo's car, Razo was hardly an innocent victim here. Rather, Razo was an active participant in the events that led to Briggs' death. Cf. *Murphy*, 270 Kan. at 804-05, 809 (felony-murder rule inapplicable when killing caused by lawful acts of innocent victim of aggravated robbery and kidnapping acting in self-defense to protect his residence and its occupants).

Pearce's suggestion that the felony-murder rule is inapplicable because Razo was the buyer and not the seller or distributer of the methamphetamine is also flawed. Razo's involvement in the drug distribution is irrelevant to establish Pearce's guilt for felony murder. The question before the jury was whether Briggs' death occurred while Pearce

11

was committing, attempting to commit, or fleeing from the underlying felony of distribution of methamphetamine. See K.S.A. 2020 Supp. 21-5402(a)(2). Pearce does not challenge the State's proof of his involvement in distributing methamphetamine. And Briggs' death followed directly from criminal violence during this drug sale, uninterrupted by any extraordinary intervening event. For these reasons, the evidence, when viewed in a light most favorable to the prosecution, was sufficient to establish beyond a reasonable doubt that Pearce was guilty of felony murder.

2. *Section 5*

Pearce argues that the Kansas Sentencing Guidelines Act (KSGA) violates his state constitutional right to a jury trial because it permits judicial fact-finding of prior convictions that enhance a defendant's sentence without first requiring the State to prove those convictions to a jury beyond a reasonable doubt. Pearce asserts that section 5 of the Kansas Constitution Bill of Rights requires a jury, not a judge, to determine penalty-enhancing prior conviction findings. Section 5 provides that "[t]he right of trial by jury shall be inviolate." Section 5 preserves the jury trial right as it existed at common law in 1859 when the Kansas Constitution was ratified. *State v. Albano*, 313 Kan. 638, 640-41, 487 P.3d 750 (2021). Pearce claims that "[p]rior to Kansas' statehood, American common law required any fact which increased the permissive penalty for a crime—inclusive of an offender's prior criminal convictions—to be proven to a jury beyond a reasonable doubt."

Pearce raises this constitutional argument for the first time on appeal. Generally, constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review. *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018). Even so, we have recognized limited exceptions to this general rule. See *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019) (listing three judicially created exceptions to the preservation requirement). Pearce claims two of these exceptions apply

here: (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case and (2) resolution of the issue is necessary to serve the ends of justice or to prevent the denial of fundamental rights. See 309 Kan. at 995. Pearce asserts that his constitutional challenge involves a pure question of law and the denial of his fundamental right to a jury trial.

In this instance there is no need to invoke an exception because this court recently rejected the same argument made by Pearce in *Albano*, 313 Kan. at 640-41.

In *Albano*, this court addressed whether the use of a defendant's criminal history—without a finding by a jury—to increase the defendant's sentence violated section 5 of the Kansas Constitution. We examined Kansas common law and noted that, in Kansas, juries have traditionally determined guilt, and the role of the court is to determine punishment and issues relevant to it, including a defendant's criminal history. Finding no authority to support the contention that Kansas had adopted a common-law rule inconsistent with this traditional division of functions when the Kansas Constitution was adopted in 1859, we held that "[s]ection 5 of the Kansas Constitution Bill of Rights does not guarantee defendants the right to have a jury determine the existence of sentence-enhancing prior convictions under the revised Kansas Sentencing Guidelines Act." 313 Kan. 638, Syl. ¶ 4.

Because criminal history findings made to impose a sentence fall within the exclusive purview of the court to determine punishment, the KSGA's method of determining a defendant's criminal history does not implicate a defendant's right to a jury trial under section 5 of the Kansas Constitution Bill of Rights. 313 Kan. at 656-57. For this reason, Pearce's constitutional challenge would necessarily fail.

Affirmed.